# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE SEARS, ROEBUCK & CO. ERISA LITIGATION | ) ) ) ) ) | No. 02 C 8324<br>Judge John W. Darrah |
| THIS DOCUMENT RELATES TO: | ) ) ) |  |

## DECLARATION OF EDWIN J. MILLS IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND APPROVAL OF THE PLAN OF ALLOCATION AND FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND CASE CONTRIBUTION AWARDS TO THE NAMED PLAINTIFFS

I, Edwin J. Mills, hereby make this Declaration pursuant to 28 U.S.C. §1746:

1. I am of counsel to Stull, Stull & Brody, ("SS & B") and have served as Co-Lead Counsel for Plaintiffs pursuant to the Order entered on March 13, 2003 (Docket No. 11") which appointed SS & B, Schiffrin Barroway Topaz & Kessler, LLP, ("Schiffrin Barroway") and Lerach Coughlin Stoia Geller Rudman & Robbins, LLP ("Lerach Coughlin") as Co-Lead Counsel for the proposed class of participants and beneficiaries of the 401(k) defined contribution retirement plan of Defendant Sears Roebuck & Co. ("Sears" or the "Company").

2. I have been engaged in the practice of securities class action law continuously since my admission to the bar in 1978. I have tried or co-tried to verdict four securities class action cases (two of them in the Northern District of Illinois) and have been either the lead or a principal negotiator for at least a dozen ERISA and securities law class action settlements, including the 2005 settlement of an ERISA class action structurally similar to this one involving the 401(k) plan of Household International, Inc. (*In re Household International, Inc. ERISA Litig.,* 02-CV-7921).

1

3. I make this Declaration to state of record facts pertaining to two pending motions, each of which will be presented at the Final Fairness Hearing which the court has scheduled for May 24, 2007 at 9:00 a.m. The motions are (1) Plaintiffs' Motion for Final Approval of Settlement, Certification of Settlement Class and Approval of the Plan of Allocation, and (2) Class Counsel's Motion for An Award of Attorneys' Fees, Reimbursement of Expenses and Case Contribution Awards to the Named Plaintiffs.

## Nature of the Litigation

4. In this case Plaintiffs Michael G. Cherperka, Bill Kehr, Kenneth L. Hawkins and Margaret Villano have alleged that Defendant Sears violated ERISA, 29 U.S.C. §1101 et seq., primarily by offering the Sears Stock Fund (consisting primarily of Sears common stock) as an investment option under the 401(k) Plan when it was not prudent to do so and by failing to disclose to plan participants important information concerning the participants' investment options.

5. The allegations made in this case center upon the operations and financial results of Sears' credit card line of business from early 2002 until at least mid-2003 as well as the general economic market conditions for traditional multi-line retailers. It is alleged that throughout 2002 and continuing until at least early 2003 Sears was experiencing significant problems, including an overall decline in its credit portfolios. It is further alleged that Sears' credit card business was a substantial driver of Sears earnings during this period and that, accordingly, participants in the 401(k) plan (as well as prospective investors) were especially interested in trends and developments affecting the credit card line.

6. Central to the case is the allegation (developed through substantial discovery, as discussed herein), that the head of the Sears credit line, one Kevin T. Keleghan, either deliberately concealed from Sears Chief Executive Officer and plan fiduciaries the serious decline and ongoing

problems in the credit card business, or, alternatively, that Mr. Keleghan was candid with Sears most senior management and plan fiduciaries about the extent of the credit card problems, but the fiduciaries failed to warn plan participants so that they could, on an informed basis, diversify out of the Sears Stock Fund and into safer, more prudent retirements savings investments. Indeed, Plaintiffs alleged that the credit card business' mismanagement -- and related accounting irregularities and stock inflation -- were so serious that, at least temporarily, the fiduciaries of the Sears 401(k) plan should have limited or discontinued further investment in Sears stock at certain times, including while Sears was conducting the internal investigation regarding Mr. Keleghan's credibility (generally in the summer and early fall of 2002) which led to Sears' dismissal of Mr. Keleghan.

7. It is further alleged that the problems in the Sears credit line business, and the ultimate public exposure of those problems, including through the announcement of Mr. Keleghan's dismissal, caused tens of millions of even potentially hundreds of million of dollars of loss in the 401(k) plan, as the value of Sears Common Stock fell from approximately $50.00 per share to less than $20.00 per share from early 2002 to early October 2002 (when Mr. Keleghan was terminated). This suit seeks to recover these plan-wide losses under ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), as well as "appropriate equitable relief" within the meaning of ERISA §502(a)(3), 29 U.S.C. §1132(a)(3).

**Prior Proceedings and Motion Practice**

8. Initially several ERISA class actions were filed in this District relating to alleged problems in the Sears credit card line business and the resulting adverse affect on the value of the Sears Stock Fund. By Order entered March 13, 2003 (Docket No. 11) this Court entered a proposed Pre-Trial Order Number One which consolidated the several ERISA cases into one case, directed the

filing of a single Consolidated Amended ERISA Complaint and appointed Co-Lead Counsel for Plaintiffs and the proposed participant class, as noted above.

9. The Consolidated Amended ERISA Complaint (Docket No. 14) was filed on May 14, 2003. Defendants promptly moved to dismiss the entire case arguing, among other things, that certain of the named defendants were not proper defendants (generally, only "fiduciaries" are proper defendants in a breach of fiduciary case such as this one); that the pleading in this case was required to satisfy the heightened standard of pleading applicable to fraud cases under Rule 9(b), and that is failed to do so, and that Sears common stock was, as a matter of law, a prudent investment option under the 401(k) plan at all relevant times because of the value (market capitalization) placed on the stock by the marketplace even after disclosure of the credit card business problems and the Keleghan dismissal.

10. The briefing on the Motion to Dismiss was extensive and dealt with several issues as to which there was no clear governing Supreme Court or Seventh Circuit authority and as to which district court opinions were being issued in similar cases throughout the country with widely-varying results. The briefing on the Motion to Dismiss also included *seriatim* submissions by both sides as relevant case laws was decided by various courts.

11. Ultimately, after considering the extensive initial briefing and the *seriatim* submissions this Court issued its Order of March 2, 2004 denying in all respects the motion to dismiss except as to Count V (Docket No. 48). Count V of the Consolidated Amended ERISA Complaint dealing with co-fiduciary liability under ERISA § 406, was dismissed with leave to re-plead. Among other things, the opinion and order of March 2, 2005 held that the allegations of the Consolidated Amended ERISA Complaint were sufficiently detailed and supported to satisfy Rule 9(b) even if, as Defendants urged, that heightened pleading standard was applicable.

**The Status of Depositions and Discovery in this Case When Settlement was Reached**

12. As discussed in the accompanying memorandum of law relating to the fairness of the proposed class action settlement, one of the factors which the Court is to consider in connection with final approval of a class action settlement is the stage of discovery and other fact-finding when the settlement was negotiated. The state of discovery and fact-finding as of settlement negotiations is an important consideration going to whether class counsel made a fully informed judgment about the likely outcome of the case when discussing settlement. Here, the proposed settlement in this case was only achieved after extensive discovery and other fact-finding. The fact-finding in this case actually commenced long before the decision on the motion to dismiss. Under ERISA §104(b), participants in a 401(k) plan are entitled, upon written demand, to the production of certain plan-related documentation, including plan annual reports and summary plan descriptions. Shortly after the consolidation of the cases in March 2003 Co-Lead Counsel for Plaintiffs made such a 104 demand and received voluminous documentation relating to the Sears 401(k) plan. This documentation analyzed closely in connection with the framing of the Consolidated Amended ERISA Complaint and enabled Co-Lead Counsel for Plaintiffs to conduct an important deposition of Sears under Rule 20(b)(6) on Plan-related matters. This deposition was conducted in September 2003.

13. Except for the 104 discovery and the Rule 30(b)(6) of the deposition of Sears on plan matters all other fact discovery in this case was conducted on a coordinated bases with the fact discovery in a securities fraud class action case pending before Judge Bucklo in this district involving alleged deceptions relating to Sears credit card business. By order entered on March 16, 2004 (Docket No. 52) this Court entered a discovery schedule establishing deadlines for both fact discovery and class-related discovery in this case in light of the ongoing overlapping discovery in the

5

securities case before Judge Bucklo. Pursuant to this Court's orders and Judge Bucko orders, as well as through frequent meet and confers involving all parties in both cases, all of the literally millions of dollars which were produced by parties and non-parties in either case were made available to all parties in both cases. Co-Lead counsel thus conducted and enormous amount of document review in this case. Further, I and other representatives of Co-Lead Counsel met face to face with plaintiffs counsel in the securities case in the conduct of "show and tell" sessions. At these meetings the documentary evidence was discussed by the several lawyers who had read the documents and were preparing for depositions. It was also at this time that decisions were made as to who to depose, on what subject matter and in what sequence.

14. As part of the coordinated discovery, Co-Lead Counsel for Plaintiffs in this case examined all, or almost all, of the merit depositions which were conducted by the securities plaintiffs in addition to separate ERISA-related discovery, which we alone conducted. In total, Co-Lead Counsel for Plaintiffs in this case conducted 18 depositions relating to problems and developments in the Sears credit line. Among the more significant depositions which we conducted were the depositions of Kevin Keleghan, the head of Sears' credit line of business, William Phelan, Sears' controller, and a number of mid-level credit card division employees who were familiar with the data (or "metrics") which provided information concerning the likely future profitability of Sears' credit portfolios. These witnesses included Fraser Hill, Richard Yang, Marlene Anderson, and Mark Vendetti. The extensive document and deposition discovery conducted in this case before the mediation with Judge Politan (discussed below) enabled Co-Lead Counsel to come to an informed judgment concerning the likelihood of success on the merits from a strictly factual standpoint prior to commencing the mediation during the present proposed settlement for $14.5 million was reached.

15. Prior to reaching settlement there was also extensive class related discovery and work

6

with experts. As to class discovery, each of the four Named Plaintiffs was required to produce documents and answer interrogatories, and each Named Plaintiff was deposed by Defendants. It was only after this class discovery was created that Defendants ultimately decided not to oppose Plaintiffs' Motion for Class Certification. Even after class certification was granted, however, the issue of class notice had to be litigated. Defendants opposed a pre-disposition notice to class members. Ultimately, the Court by Order entered on February 15, 2006 (Docket No. 90) directed that an individual notice be mailed to all class members-participants at their last known addresses to be provided by Sears. After the Order of February 15, 2006 the parties herein met and conferred and were able to agree upon the content of the class notice.

16. Individual notice of pendency of this class action has thus already been provided by fist class mail to the approximately 130,000 members of the Class, which was defined in the Order of February 15, 2006 and other orders as all participants and beneficiaries of the Sears 401(k) plan at any time from January 17, 2002 to the present.

17. The settlement in this case was also only reached after Co-Lead Counsel for Plaintiffs had retained experts to assist them in the litigation and to prepare expert reports required by Rule 26(a). When the settlement was reached the experts retained by Co-Lead Counsel for Plaintiffs had substantially completed their expert reports in the areas of damages and relief, credit card industry practices and disclosure requirements and related matters. Indeed, Plaintiffs expert report in the area of damages and relief was transmitted to defense counsel under Rule 408 at the request of the mediator.

### The Strength of Plaintiffs' Case Measured Against the Benefit Achieved By Settlement

18. As set forth in the accompanying memorandum of law another important factor

relating to whether the Court should give final approval to the class action settlement in this case is a comparison of the strength of plaintiffs' case with the benefits achieved by settlement. Here, plaintiffs believed they had a strong case, but the risks of a judgment for defendants were also real. Among the factors which Plaintiffs would cite in support of a favorable trial outcome for the class are the following:

  A. When serious issues were raised within Sears' management ranks about Keleghan's credibility and whether the credit card line of business was on track, no special notice or caution was provided to the Plan participants relating to such issues. While Defendants would undoubtedly argue that any such notice would have been inappropriate and perhaps even unlawful (under insider trading laws) plaintiffs would argue that the ERISA-imposed duty of loyalty required the Plan's fiduciaries to place the interest of the participants above all else and, in this context, provide a special warning to participants so that they could consider diversifying out of the Sears Stock Fund.

  B. The connection between Sears' credit card problems and the market price of Sears common stock seems evident. When Keleghan was terminated in the Fall of 2002 and Sears announced less than anticipated operating results from the credit card line the market price of Sears common stock declined significantly. Plaintiffs had obtained expert proof connecting the credit card problems with the market price decline when the settlement was reached, but even without expert proof Plaintiffs believed that causation would not be a difficult issue upon which to prevail in this case.

  C. Plaintiffs believed that they would be able to effectively impeach the Keleghan deposition testimony in this case to the effect that for at least the first half of 2002 the credit card line was essentially on track and that all reasonable steps were taken to manage the credit card line and

minimize loss when, later in 2002, a serious and unexpected decline in credit card line performance took place. Plaintiffs believed that documentary evidence would undermine Keleghan's testimony that everything was on track until at least the Summer of 2002, and Plaintiffs would also refer to a settlement payment received by Keleghan from Sears resulting from Keleghan's defamation suit against Sears as part of such impeachment.

19. There were, however, countervailing points upon which Defendants would undoubtedly rely at trial or on summary judgment. Among those points are:

A. Under ERISA §404(c), the burden of investment loss shifts from the fiduciaries to the participants. The statute, and the rules thereunder, are complicated and it cannot be guaranteed whether Defendants would prevail on their 404(c) defense. If the Defendants prevailed on their 404(c) defense the class here would have received nothing.

B. There was no indication that the SEC or the Department of Labor had found any improprieties in connection with either Sears' public disclosures about the credit card line problems and/or Keleghan's termination or Sears' management of the 401(k) Plan. Defendants would undoubtedly attempt to introduce evidence of the lack of any governmental action as an indication that no improprieties actually occurred.

C. As mentioned above, the market price of Sears common stock rebounded quickly after the drop in the third quarter of 2002. Indeed, the market price of Sears common stock had effectively obtained its pre-drop level by mid-2003, from which Defendants would argue that participants who held their stock through mid-2003 had no and, further, even the Plan itself had no recoverable loss when the stock price rebound in 2003 is taken into consideration. While Plaintiffs disagreed, believing that the 2003 market rebound was essentially an unrelated development which could neither increase or decrease the Plan's losses resulting from the credit card line problems, it is

not certain how the Court would have ruled on this issue. Plaintiffs did consider the stock rebound issue to be an obstacle to ultimate success in the case, and also consider the stock rebound issue to be an important fact to address in crafting a Plan of Allocation which would, fairly, concentrate the recovery by settlement in those participants who sold their Sears stock in the 401(k) accounts when the stock declined in the third quarter of 2002.

        D.      As discussed in the accompanying memorandum of law, the opinion in *Summers v. State Street Bank & Trust Co.,* 453 F.3d 444 (7th Cir. 2006), raised an additional obstacle to success in this case. That opinion raised a serious issue as to whether an artificial inflation in the market price of Sears stock would be sufficient to require action (such as diversification) by the fiduciaries of the Sears 401(k) Plan, since the market still place a significant value on Sears as a company even after the Keleghan termination and the drop in Sears' market price. While Plaintiffs believed that the participants in this case were much more risk averse than the airline pilot class in *Summers*, this distinguishing *Summers* on an outcome-determinative issue, there was no certainty as to how this Court would interpret and apply the various pronouncements in *Summer* to the evidentiary record in this case.

### The Mediation Conduted by Juge Politan and the Absence of Collusion

20.    I personally participated in the settlement discussions in this case and the mediation conducted by Judge Politan, discussed below. I state of record that there was no collusion involved in the settlement to of this case. All settlement negotiations were conduct at arms-length by adversarial counsel and parties (to the extent that Sears' management was involved in the mediation through Judge Politan). This history of settlement negotiation and mediation in this case is as following:

21.    Near the end of fact discovery in this case and close to the deadline for the exchange

10

of expert reports Co-Lead Counsel for Plaintiffs herein was contacted by former United States District Judge Nicholas H. Politan, who indicated that he had been working to try to settle the securities case before Judge Bucklo (unsuccessfully as of the initial contact to us) and that it might be an appropriate time to explore settlement possibilities in the ERISA case. Co-Lead Counsel for Plaintiffs agreed, and numerous telephone conversations and face-to-face meetings ensued. These meetings focused on disputed and undisputed facts, disputed issues of law, the fact that Sears' stock price had rebounded tremendously since hitting its nadir in late 2002 (meaning that plan participants who held Sears stock during the rebound period might have no loss but a substantial profit) and other relevant considerations.

22. The initial mediation efforts in this case were unsuccessful. Indeed, the initial mediation efforts was so unsuccessful, and seem so unlikely to ultimately prove fruitful, that Co-Lead Counsel for Plaintiffs decided to mail to class members the notice of pendency of class action discussed above, which would have been unnecessary had settlement then seemed in the offing.

23. After the notice of pendency was mailed, the mediator contacted Co-Lead Counsel for Plaintiffs and the mediation resumed. The focus, again, in the resumed mediation was on both disputed factual issues (were the plan fiduciaries victims of Keleghan's concealment of facts?) and on significant recent legal developments. In particular, the Seventh Circuit Court of Appeals had by then issued its decision in *Summers v. State Street Bank & Trust Co.,* 453 F.3d 404 (7th Cir. 2006), which Defendants read to bolster their defense that Sears stock would not be found to be an imprudent investment under the 401(k) plan in light of its substantial market capitalization even after disclosure of the credit card problems. Plaintiffs countered by suggesting that even under *Summers* (1) employer stock may be found imprudent giving the relative "risk averseness" of the participant class, and that Sears' participants were likely to be more risk averse than the airline pilot class

11

involved in *Summers* and (2) *Summers* is arguably inapposite as it did not involve, as here, employers stock "artificially inflated" – *i.e.* destined to fall – upon disclosure of **non-public** corporate mismanagement and malfeasance.

24. Ultimately, the mediation conducted by Judge Politan was successful and in agreement in principle was reached to settle this case for $14.5 million in cash. The complete terms of the settlement are set forth in the Class Action Settlement Agreement executed on February 23, 2007 on file with the Court.

### Questions as to Recoverable Damages in View of Stock Rebound: The Need for a Plan of Allocation

25. Based on the authorities discussed in the accompanying memorandum of law I am aware that the Court will consider the $14.5 million obtained in settlement against the maximum likely recover if the case was completely successful, in light of the risks that Plaintiffs would lose.

26. It is difficult to determine the likely maximum recovery in this case, for the reasons discussed below. The number of shares of Sears Common Stock in the 401(k) plan was consistently between 20 million and 25 million shares. The $14.5 million settlement thus provides a recovery in the range of .60 cents to .70 cents for each share in the Plan prior to any deduction for attorneys' fees or expenses. I believe this to be a favorable and fair settlement in light of the litigation risks now discussed.

27. In negotiating this settlement I and Co-Lead Counsel for Plaintiffs had to seriously consider the possibility that the final judgment in this non-jury case might be for Defendants. Among other things, the Court of Appeals July 2006 decision in *State Street,* cited above, suggest that it may not be a breach of fiduciary duty to fail to liquidate an employer stock position if a fully-informed market places a substantial value on the employer stock. Here, even after disclosure of the

credit card problems at Sears and even after the Keleghan's dismissal Sears stock traded at almost $20.00 per share and had a multi-billion dollar market cap. Under these circumstances the claim for imprudent investment might fail (although, as noted above, Plaintiffs would argue that the Class in this case is considerably more risk averse than the airline pilot class in *State Street*.)

28. The rebound in Sears' stock price also necessitated careful consideration of how the $14.5 million settlement proceeds should be allocated among individual class member/participants. Simply put, a class member in this case who held the Sears Stock Fund in his 401(k) account throughout 2002 and 2003 did not suffer a loss; the value of his retirement savings increased because of the stock price rebound. Co-Lead Counsel for Plaintiffs has recognized this factor, and crafted an appropriate Plan of Allocation, to make sure that the benefits of the settlement go principally to those class members who disposed of their Sears stock holdings prior to July 30 2003 (after this date it is difficult to conjure how anyone could contend that Sears' stock was then an imprudent investment or that all of the bad news about the credit card line was not publicly available). Accordingly, I and other Co-Lead Counsel conferred with the Defendants' counsel and crafted a Plan of Allocation (which is annexed to the previously-filed Stipulation of Settlement) which effectively assigns most of the settlement proceeds in this case to those who were most harmed by the alleged breaches of fiduciary duty: those participants who dispose of Sears stock in their 401(k) accounts in the second half of 2002 and early 2003, when Sears' stock price was at a low point and prior to the stock rebound which had effectively erases the 2002 losses by July 30, 2003. While the Plan of Allocation need not be approved by the Court for the settlement to become final Plaintiffs are separately moving for an Order approving the Plan of Allocation to most fairly distribute the settlement proceeds to those most adversely affected by the conduct alleged in this case. The Plan of Allocation is attached to the Settlement Agreement as Exhibit E.

### The Complexity Length and Expense of Continued Litigation

29. Another factor in favor of settlement approval is what litigation efforts remain to be undertaken, for which duration of time and at what costs, if the settlement is not approved. Briefly, If settlement is not approved expert discovery costing hundreds of thousands of dollars would have to go forward, extensive summary judgment motions based on the enormous deposition and discovery record in this case would have to be prepared, a Final Pre-Trial Order would have to be drafted by both sides and, if the entire case could not be decided on summary judgment, there would have been a trial , which would probably last several weeks. One of the clear benefits of the present Settlement is the avoidance of such further costs (to both the parties and the resources of the Court). The settlement will also provide payments to the class members soon, and not, realistically, one or more years from now (depending on appeals).

### The Lack of Class Member Objection

30. Plaintiffs counsel have retained A.B. Data, Ltd. to assist in notifying the class of the proposed settlement. A.B. Data (by Anya Verkhovskaya) (Exhibit A hereto) has filed separate proof that over 130,000 class members have been individually notify of the settlement, of the May 24, 2007 Final Fairness Hearing and of class members' right to objection to the settlement.

31. Only two objections have been received. This result, by itself, strongly suggest that the proposed settlement is fair and that class members support.

32. The two objections are from class members John Giorgakis (Exhibit B hereto) and (Lula Pickett) (Exhibit C hereto). With all due respect to these class members neither objection has merit or should derail the settlement. The Giorgakis objection is really an objection to the attorneys' fees requests not to the settlement itself except that Mr. Giorgakis prefers that Sears pay class counsel attorneys' fees on top of the $14.5 million settlement fund. We tried, but such a

substantially greater amount to be paid by Defendants could simply not be accomplished here, despite the best efforts of very experienced class counsel negotiating with the assistance of an experienced federal judge. And Mr. Giorgakis' objection to the size of the attorneys' fee requests is also without merit because as discussed below, class counsel actually put in more than the double the amount of attorneys and paralegal time than they are requesting from the Court. In effect, if class counsel's fee motion is granted in full class counsel will receive a reduction to their aggregate lodestar of over 50%. Mr. Giorgakis's fee objection is thus without merit.

33. As to objector Lula Pickett, it is difficult to understand her objection. Her objection seems to be that the Sears 401(k) Plan was not harmed by the breaches of duty alleged by Plaintiffs, but if that is correct it *supports* the settlement, it does not undermine it. Plaintiffs, of course, also disagree with the proposition that the Plan was not harmed by the alleged fiduciary breaches; the decline in the market price of Sears stock when Keleghan was terminated would seem to support the notion that the Plan was, in fact, harmed (although, again, the parties disagree about whether that harm was effectively erased by the stock price rebound). In any event, the objection of Ms. Pickett should also not derail the settlement.

**Independent Fiduciary Approval**

34. Because a class action settlement involving an employee benefit plan and its fiduciaries may raise conflict of interest/prohibited transactions issues, the approval of an independent fiduciary has been requested in connection with this settlement. The independent fiduciary is State Street Bank & Trust Company ("State Street"). I participated in a meeting with State Street's representative to discuss why this proposed settlement should be approved by the independent fiduciary. State Street has indicated by letter that it approves of the settlement, and that some evidence of that approval will be available by the Final Fairness Hearing.

15

## Form of Final Judgment

35. At the hearing at which the Court granted preliminary approval of this class action settlement the Court focused the parties attention on Seventh Circuit precedent relating to the issue of whether the District Court may approve a class action settlement and also retain jurisdiction over the case, such as to deal with settlement administration matters or unclaimed funds or funds that cannot be distributed for some reasons. Class counsel have consulted the applicable Seventh Circuit authorities and have prepared a Final Judgment for the Court's consideration consistent with such authorities. The proposed Final Judgment will be emailed to Chambers in accordance with the Court's rules.

## The Motion for Attorneys' Fees

36. I also submit this Declaration to state of record facts supporting the motion for class counsel's attorneys' fees and reimbursement of expenses, and the requested compensation awards to the four Named Plaintiffs, all of which amounts shall be paid out of the settlement fund in accordance with the terms of the Stipulation of Settlement as approved by the Court.

37. The motion request attorney fees of $4,350,000, or 30% of the settlement fund. The fee request should be granted in full, for the following reasons:

    A. Out of the 130,000 class members who have been individually notified that class counsel would seek up to 30% of the settlement fund as their fees under the common fund doctrine, only one class member Mr. John Giorgakis, has objected. Under the case law this virtual lack of objections support the fee requests (the details of the Giorgakis' objection are responded to above).

    B. Although class counsel seeks fees of $4,350,000, the aggregate value of the attorney and paralegal time ("lodestar") of all Plaintiffs counsel in this case is $10,683,906.00. Thus,

even if the fee requests is granted in full, class counsel will not close to being compensated for their straight time in this case.

    C.  All Plaintiffs counsel in this case have worked on the case since 2003 on an entirely contingent basis. In other words, if the case had been lost at the pleading stage, or if it would have been lost at summary judgment or trial, or if it would have been lost due to an intervening change in the law or legal development (such as the Seventh Circuit's July 2006 Opinion in *Summers v. State Street*) Plaintiffs counsel would have worked on this case for years for no compensation. As noted in the accompanying memorandum of law, acceptance of a case on a contingent fee basis, as here, usually justifies a fee in excess of straight time, to reflect the substantial risk of non-payment built into the contingent fee. Here, if the fee motion is granted in full class counsel will still not receive any amount above lodestar to reflect the contingent nature of the fee; indeed, class counsel will receive *less than half* of their straight time. Thus, in response to the Giorgakis' objection, class counsel are not seeking some windfall amount not earned, but an amount which does not even come close to their straight time in the case.

    D.  The benefit obtained for the class also supports the fee requests. Particularly after *Summer v. State Street*, and also particularly in light of the Sears stock price rebound in 2003, obtaining a class wide benefit of $14.5 million is evidence of a job well done meriting appropriate and fair compensation under the common fund doctrine.

    E.  Also supporting the fee requests is what the market would charge (or bear) for the legal services rendered by class counsel in this case. As discussed in the accompanying memorandum of law the fee award in this case is supposed to mirror what fees would be paid for a comparable representation in the private market place. It is difficult to envision a situation where experienced counsel would accept a case involving the risks which this case had and has, against

very experienced counsel and well-funded corporate entity, without a percentage fee of 30% or even higher. Further, the fee awards in similar class actions support the 30% fee here requested; the accompanying Memorandum of Law identifies some of the comparable class actions and resulting fee awards.

        F.        Finally, the experience and qualifications of class counsel also support the fee request. Class counsel here are some of the country's most experienced firms in the field of complex and class action litigations. *See* attached resumes of Class Counsel (Exhibit D). Again, when one considers what the private market place would pay for attorneys' services in a complex matter such as this one, it is difficult to conclude that the 30% fee request made here is anyway excessive or unfair to the clients (the 130,000 class members).

38.    Attached hereto as Exhibit E is a chart setting forth the lodestar and expense calculations of all Plaintiffs counsel in this case. As demonstrated by Exhibit E, the aggregate lodestar of Plaintiffs counsel is $10,683,905.75. Aggregate expenses are $978,600.59. Before addressing the issue of expenses, I wish to point out to the Court that each Plaintiff firm has prepared an affidavit attesting to the details of its lodestar and expense calculations, which affidavits I shall be prepared to provide to the Court if requested at the May 24, 2007 Final Fairness Hearing. Also, daily time records for each attorney who worked on this case will also be made available after the May 24, 2007 Final Fairness Hearing if requested by the Court. I have personally participated in this case since the beginning; I know which attorneys and firms rendered what services in the case. I believe that the attorney and paralegal time and services support the requested fee of $4,350,000.

## The Expense Motion

39.    By motion Plaintiffs are also requesting reimbursement of their out-of-pocket expenses in this case in the aggregate amount of $978,600.59 (see Exhibit E hereto). As noted,

individual firm affidavits as to expenses will be available to the Court at the Final Fairness Hearing or as directed by the Court. I believe that the requested expenses were reasonably incurred in the prosecution of this litigation.

### Case Compensation Awards to the Named Plaintiffs

40. By motion Plaintiffs are also requesting that the Court award $5,000 to each of the four Named Plaintiffs (Michael G. Cherperka, Bill Kehr, Kenneth L. Hawkins, and Margaret Villano). My firm's client in this matter is Kenneth L. Hawkins. I have regularly conferred with Mr. Hawkins about the progress of the case and other matters, with such consultations being especially frequent when Defendants requested and obtained document discovery and then a deposition from Mr. Hawkins. I know that Mr. Hawkins has spent a considerable amount of his own time in traveling to New York City from his home in Mobile, Alabama for his deposition and in connection with his other discovery activities and consultations with me throughout the litigation. Mr. Hawkins' declaration – along with affidavits or declarations from some or all of the other Plaintiffs – is attached hereto as Exhibit F. While I have not personally communicated with the Plaintiffs other than Mr. Hawkins I am aware that each of the four Plaintiffs gave a deposition and thus spent at least some of their personal time in the prosecution of this litigation. I believe the requested compensation awards are also supported by applicable law (as set forth in the accompanying memorandum of law) and I know that the $5,000.00 compensation amount has been approved in at least two class action cases which I litigated within the last three years. I am referring to the 401(k) employer stock class actions involving Lucent Technologies (in the District of New Jersey) and Sprint Corp. (in the District of Kansas).

### Proposed Order

41. A proposed order relating to the attorneys' fees/reimbursement of expenses/Named

Plaintiffs compensation awards motion shall be transmitted by email to Chambers in accordance with the Court's rules.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: May 17, 2007

s/Edwin J. Mills_____<br>Edwin J. Mills